IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

WILLIAM HAWKINS, et al., )
)
    Plaintiffs, )
)
v. ) No. 1:05-cv-1256 (LMB/JFA)
)
LASZLO BORSY, et al., )
)
    Defendants. )

## MEMORANDUM OPINION

Before the Court is respondents' Joint Motion to Vacate for Lack of Subject Matter Jurisdiction [Dkt. No. 323]. For the reasons that follow, defendants' Motion will be granted.

### I. BACKGROUND

Plaintiffs William Hawkins ("Hawkins"), Eric Keller ("Keller"), Thomas Zato ("Zato"), Kristof Gabor ("Gabor"), and Justin Panchley ("Panchley") (collectively, "plaintiffs") are currently attempting to enforce an eleven-year-old default judgment against corporate affiliates of one of the original defendants in this civil action. They assert a right to relief under both Fed. R. Civ. P. 65 civil contempt and Fed. R. Civ. P. 25 successor liability.[1]

The defendants are Laszlo Borsy ("Borsy"); Mediaware Corporation ("Mediaware"); MediaTechnik Kft. ("MediaTechnik"); DMCC Kommunikacios Rt. ("DMCC"), which changed its name to DIGI Zrt. on January 31, 2007, and changed its name again to i-TV ("i-TV") on June 12, 2012; and Peterfia Kft. ("Peterfia"). The respondents are DIGI Communications N.V. ("DIGI Comms.") (formerly known as Cable Communications Systems, N.V., or "CCS"); RCS & RDS S.A. ("RCS/RDS"); RCS Management S.A. ("RCS"); DIGI Távközlési és Szolgáltató Kft.

---

[1] For clarity, this Memorandum Opinion will refer to the defendants named in the Complaint as "defendants" and will refer to the entities against which enforcement is sought as "respondents."

("DIGI Kft.") (formerly known as Egyesült Magyar Kábeltelevízió, or "EMKTV"); and Zoltan Teszari ("Teszari").

A brief description of the background events is needed to appreciate the current posture of this litigation. Borsy first approached Hawkins in 2001 about investing in his company MediaTechnik. Mem. Op. [Dkt. No. 94] 7. Hawkins was interested in the investment and paid $330,000 for 35% of MediaTechnik's stock and 33.33% of Peterfia's stock. Id. In 2003, Borsy approached Hawkins again, this time about a "roll up" deal in which MediaTechnik, Mediaware, Peterfia, and DMCC would become part of the same corporate family. Id. at 7-8. After negotiations, Hawkins and Borsy agreed that Hawkins would pay $1 million for a 49% stake in MediaTechnik, which would entitle him to a corresponding 49% stake in Mediaware, DMCC, and Peterfia. Id. at 8. Hawkins subsequently paid the $1 million. Id.

Borsy diverted those funds, using them to purchase the remaining interest in DMCC, which made Borsy that company's sole owner. Id. Hawkins did not receive a 49% stake in DMCC or Peterfia as provided for in the agreement. Id. Borsy also forged Hawkins's signature on a document Borsy prepared that purported to give Hawkins's Mediaware voting rights to Borsy. Id. The remaining plaintiffs had been offered management positions in the combined companies in exchange for their services and were to be compensated with salaries ranging from $72,000 to $250,000 and equity in one or more of the companies. Id. at 9-11. None received any compensation from any of the defendants. Id.

Thus began the tortured procedural history of this civil action. Plaintiffs filed a Complaint on October 31, 2005, alleging fraud, breach of contract, conversion, breach of fiduciary duties (against Borsy), and unjust enrichment and seeking an accounting of all transactions by or among defendants and a declaration establishing their ownership interests in the corporate

2

defendants. Id. at 2. Borsy belatedly filed several documents on behalf of all defendants, but they were written in Hungarian. Id. at 3. The Court struck those filings, giving defendants an opportunity to file translations, which they failed to do. Id. Accordingly, at plaintiffs' request, default was entered on March 13, 2006. Id.

Defendants subsequently obtained counsel and filed a motion to set aside the default, which was granted. Id. After DMCC's and Peterfia's motions to dismiss were denied, their counsel withdrew, citing nonpayment of legal fees. Id. After defendants failed to obtain new counsel or participate in discovery requests, a new default was entered against them on June 15, 2006. Id. at 3-4. On September 15, 2006, following an ex parte hearing on damages at which no one appeared for any defendant, the magistrate judge issued a Report and Recommendation ("Report"), recommending that a default judgment be entered against defendants.

On September 28, 2006, the Court received a letter from Borsy seeking a 30-day extension to file objections to the Report, which request was granted. Id. at 5. The next day, September 29, 2006, plaintiffs filed an Emergency Motion to Reconsider the order granting Borsy an extension. [Dkt. No. 109] Ex. 8, at 2. The Court did not revoke the extension of time but did impose an injunction on October 2, 2006 "to prevent the defendants from disposing or dissipating assets subject to this litigation or undertaking transactions affecting the property at issue without consent of the plaintiffs." Id.

According to plaintiffs, just four days later, despite the injunction's command that Borsy refrain from "undertaking any transactions out of the ordinary course of business" involving the companies at the heart of the litigation, Borsy transferred most of his shares in DMCC to two different entities: Digital Media Communications and Technology Fund S.A. ("DMCT") and

3

DIGI Kft. [Dkt. No. 109] 6; id. Ex. 10. In December 2006, RCS/RDS formally registered as majority shareholder of DIGI Kft.

Borsy ultimately filed his objections to the Report, which this Court overruled. Mem. Op. 17. Accordingly, judgment was entered on February 8, 2007 against all defendants jointly and severally as follows:

| Plaintiff | Monetary Award | Equity in Defendant Companies |
| --- | --- | --- |
| Hawkins | $750,000.00 | 42.14% |
| Keller | $660,000.00 | 9.17% |
| Gabor | $146,763.11 | 1.79% |
| Panchley | $110,678.64 | 0.98% |
| Zato | $140,131.95 | 2.06% |
| **TOTAL** | $1,807,573.70 | 56.14% |

[Dkt. No. 97].

On May 4, 2007, Keller contacted DIGI Kft.'s general counsel by email. [Dkt. No. 109] Ex. 13. He wrote:

> Dear Mr. Kosik,
>
> I understand that you spoke with my colleague, Kris Gabor, last week concerning the DMCC [i.e., i-TV]/EMKTV [i.e., DIGI Kft.] transaction. We both appreciate your prompt reply to his call and your attention to this matter. . . .
>
> I represent a group of US-based shareholers in DMCC. Recently, as part of a larger judgment involving Laszlo Borsy and DMCC, as well as some other companies, Judge Brinkema in the United States Federal District Court for the Eastern District of Virginia awarded me and the other US shareholders just over 56% of DMCC. However, we have recently learned that, apparently, after Judge Brinkema issued an injunction on October 2 blocking any sale of DMCC, it was sold to your company. I am attaching a copy of the October 2 Order as well as the February 6, 2007 Order[2] awarding us ownership of the interest in DMCC. The February 6 Order outlines much of the facts and procedural history, but I am happy to provide more information if you wish.

---

[2] The original judgment order, dated February 6, 2007, was amended on February 8, 2007, to correct a typographical error.

4

> We have not yet instituted legal proceedings in the US or in Hungary to enforce the judgment. Our strong preference is to see DMCC in the hands of a proven, skillful and aggressive operator like EMKTV who can unlock the value in the assets. As a group of well-respected former senior executives of AOL Time Warner and Zenith, we well aware [sic] of the value that can be created in a subscriber business, but have also seen all too well how that value can be stifled by infighting, mismanagement and greed. . . .
>
> Best regards,
> Eric Keller

Id. On May 17, 2007, Keller followed up with an email containing a zip file with various documents filed in this court, including the Judgment Order and accompanying Memorandum Opinion. Id. Ex. 14. On September 5, 2007, an email from Keller to Hawkins and Gabor indicates that he was having ongoing discussions with DIGI Kft. but that those conversations were "friendly but uninformative." Id. Ex. 15. On September 14, 2007, Dr. Bogó Daniel, who was presumably involved with DIGI Kft. in some capacity, sent Keller an email, which reads in its entirety: "With reference to our discussion I send you the balance sheet of the DMCC Zrt. made in the year of 2006." Id. Ex. 16, at 2.

The attached balance sheet is in fact the 2006 Annual Report for DMCC (which changed its name to DIGI Zrt. on January 31, 2007).[3] Id. at 3. That balance sheet included the following statement apparently regarding the default judgment:

> Based on the decision of the U.S. court, the amount of HUF 346,367,000, related to the proceeds from the loans previously used in the company, was booked as an extraordinary expense. This issue is currently undergoing a legal review; therefore, it has been fully booked as deferred expense for the year 2006.

Id. at 5.

On January 23, 2008, Borsy, Mediaware, and MediaTechnik filed a Motion to Set Aside Final Judgment, [Dkt. No. 99], which was denied on February 8, 2008, [Dkt. No. 103]. Borsy

---

[3] Although Daniel wrote that this balance sheet was "made" in 2006, it is dated May 29, 2007. [Dkt. No. 109] Ex. 16, at 3.

5

appealed. [Dkt. No. 104]. On October 9, 2008, while the appeal was pending, Borsy and DMCT retained an attorney (DIGI Zft.'s general counsel Kosik) to execute an agreement to transfer DMCT's 48.7% stake in DIGI Zrt. to DIGI Kft. [Dkt. No. 109] Ex. 17, at 2. On October 15, 2008, DIGI Kft. issued amended Articles of Incorporation for DIGI Zrt. listing DIGI Kft. as the sole shareholder for DIGI Zrt., id. Ex. 19, at 2, which was renamed i-TV on January 12, 2012, id. Ex. 3, at 2.

On November 24, 2008, the Fourth Circuit affirmed the default judgment against all defendants. Hawkins v. Borsy, 319 F. App'x 195, 196 (4th Cir. 2008). In March 2009, the plaintiffs obtained $5,149.76 through a garnishment proceeding against Borsy in D.C. Superior Court. See [Dkt. No. 109] Ex. 2, at 2. That was the only recovery they have made on the judgment. Id.

In 2010, plaintiffs considered the possibility of filing an action to enforce the judgment in Hungarian court. See id. Ex. 22, at 3-4. They contacted the U.S. Embassy in Budapest for advice, and on June 8, 2010, received the following response from a commercial counselor in the embassy:

> I read through the attachment and tried to find some information on the company. It still exists on the Internet, but we have not had any interactions with them. Given the length of time that the case has been in litigation, and the fact that most of this happened 7 or 8 years ago, I do not see what we can do to help. We can certainly put the person in touch with legal counsel in Hungary, but our experience with the judicial system here has not been great. I think he did the right thing by pursuing the matter through US courts, but that has not resolved the problem it seems. I am sorry I do not have any bright ideas on this one…

Id. Discouraged by this response, plaintiffs did not institute any proceedings in Hungary. This correspondence with the embassy appears to have been the last effort that any plaintiff made to collect on the judgment until filing the pending Motion to Enforce on May 2, 2017.

6

In their Motion to Enforce, plaintiffs argue that respondents are responsible for satisfying the original judgment under two separate theories: first, that the respondents are the defendants' successors in interest under Fed. R. Civ. P. 25(c); and, second, that the respondents themselves are in civil contempt of court under Fed. R. Civ. P. 65(d) because of their role in helping the original defendants violate the Order enjoining them from disposing of the corporate assets. See [Dkt. No. 109] 13-24. Respondents[4] argue that this court does not have personal jurisdiction over them, as they have no contacts with Virginia; that plaintiffs had not established the elements of contempt with respect to respondents (as opposed to with respect to the original defendants); that they are not appropriate successors in interest to the original defendants (and holding them liable for the judgment against the defendants would require piercing the corporate veil); and that there may be other defenses on the merits to the claim even if they are appropriately held responsible for satisfying any judgment against defendants (e.g., laches). See Resp. Opp. [Dkt. No. 127].

Since the original hearing on the Motion to Enforce, plaintiffs have joined Teszari as a respondent in this action [Dkt. Nos. 198 & 224] and have completed service under the Hague Convention on the "DIGI Hungarian Entities," i-TV and DIGI Kft. After being served, the DIGI Hungarian Entities filed a Motion to Vacate the Default Judgment and Dissolve Injunction and Abstain from Further Proceedings, in which they asked the Court to vacate the default judgment, dissolve any injunction in place, and abstain from further proceedings on the underlying action because Hungary is a better forum. [Dkt. No. 255]. On October 27, 2017, the Court granted plaintiffs' Motion to Stay the Motion to Vacate, essentially holding the Motion to Vacate in abeyance until the end of discovery. The DIGI Hungarian Entities have appealed that decision. On November 17, 2017, the Court heard argument on respondents' Motion to Stay Discovery

---

[4] At that time, only respondents RCS/RDS, RCS, and DIGI Comms. had been served.

pending the appeal of the Motion to Stay the Motion to Vacate. On that day, defendants raised for the first time a possible problem with subject matter jurisdiction. Given the potential seriousness of that issue, the Court stayed discovery, with the exception of discovery relevant to subject matter jurisdiction, and invited the parties to brief threshold legal issues addressing the validity of the judgment. [Dkt. No. 319].

All of the respondent/defendant entities have now filed a Motion to Vacate the Default Judgment ("Motion to Vacate"), arguing that the Court lacked subject matter jurisdiction over this civil action because at least one of the original defendants, Peterfia kft., should be treated as a limited liability company ("LLC"), not as a corporation, for purposes of diversity citizenship and that, if treated as such, Peterfia was not diverse from all plaintiffs when the Complaint was filed because Hawkins was a member of Peterfia. [Dkt. No. 323]. The Motion has been fully briefed [Dkt. Nos. 324, 332, & 337] and oral argument has been held. For the reasons that follow, defendants'/respondents' Motion to Vacate will be granted.

## II. DISCUSSION

### A. <u>Standard of Review</u>

A federal court has jurisdiction to hear controversies involving over $75,000 when the civil action is between "citizens of a State and citizens or subjects of a foreign state" or "citizens of different States and in which citizens or subjects of a foreign state are additional parties." 18 U.S.C. § 1332(a).[5] To maintain an action under diversity jurisdiction, there must be complete diversity, which means jurisdiction is improper if any plaintiff is a citizen of the same state as any defendant. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267-68 (1806). A judgment is

---

[5] Section 1332 has been amended since the Complaint in this civil action was filed; however, neither party argues that the changes make a difference for the purposes of the present motion. For ease of reference, all quotations in this Memorandum Opinion are from the current version.

8

void for lack of subject matter jurisdiction when there is a "total want of jurisdiction" without any "arguable basis" on which the court could have found that it had jurisdiction. Wendt v. Leondard, 431 F.3d 410, 413 (4th Cir. 2005) (internal quotation marks omitted).

### B. Analysis

Preliminarily, plaintiffs claim that the Motion to Vacate is barred by res judicata because some of the original defendants previously filed a Rule 60 motion and this argument could have been raised at that time.[6] Pl. SMJ Opp. [Dkt. No. 332] 9. Plaintiffs cite no authority, and the Court can find none, supporting the proposition that a challenge to subject matter jurisdiction can be barred by res judicata. Indeed, subject matter jurisdiction "cannot be forfeited or waived, and can be raised by a party, or by the court sua sponte." In re Kirkland, 600 F.3d 310, 314 (4th Cir. 2010).[7] Moreover, "a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits" and any dismissal for lack of subject matter jurisdiction cannot support a claim of res judicata. S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC, 713 F.3d 175, 185 (4th Cir. 2013). Similarly, the Court concludes that a subject matter jurisdiction challenge, which attacks the ability of the court to enter the original judgment, cannot be barred by res judicata dependent on the very judgment the party is attacking as void.

For purposes of diversity jurisdiction, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state

---

[6] The Rule 60 motion was denied and the Fourth Circuit affirmed the denial. See Hawkins v. Borsy, 319 F. App'x 195 (4th Cir. 2008). In that motion, some of the original defendants challenged the court's subject matter jurisdiction, but only on the grounds that one of the original defendants had its principal place of business in Virginia, destroying diversity. See Br. for Appellants at*9-*10, 2008 WL 2563417, Borsy, 319 F. App'x 195. In that motion, neither party addressed—and the court did not consider—the status of a kft. for purposes of diversity jurisdiction.

[7] It is clear that such a challenge to subject matter jurisdiction is a proper subject of a post-judgment motion under Fed. R. Civ. P. 60(b)(4), and there is no time limit for such a challenge. See In re Heckert, 272 F.3d 252, 256-57 (4th Cir. 2001).

where it has its principal place of business." 28 U.S.C. § 1332(c)(1). Business associations other than corporations are considered citizens of each state in which individual partners or members maintain citizenship. See Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC, 636 F.3d 101, 103 (4th Cir. 2011) ("For purposes of diversity jurisdiction, the citizenship of a limited liability company (such as Mountain State) is determined by the citizenship of all of its members."). For domestic business enterprises, this split between corporations and other business entities produces a bright-line rule; however, applying this rule to a business enterprise based in a foreign nation is a "difficult" and underexplored problem because "[b]usinesses in other nations may have attributes that match only a subset of those that in the United States distinguish a 'corporation' ... from forms such as the limited liability company." Fellowes, Inc. v. Changzhou Xinrui Fellowes Office Equipment Co., 759 F.3d 787, 788 (7th Cir. 2014).[8] Neither party cites to any case law from the Fourth Circuit, and the Court knows of none, addressing the appropriate test for determining whether a foreign business enterprise is a "corporation" for purposes of §1332(c); however, the parties appear to agree that the Seventh Circuit's case law, which provides that the appropriate test involves simply determining whether the foreign form of business organization is more like a corporation or more like a different domestic type of organization (such as a limited liability company) is sensible. See White Pearl Inversiones S.A. (Uruguay) v. Cemusa, Inc., 647 F.3d 684, 686 (7th Cir. 2011); Resp. SMJ Mem. [Dkt. No. 324] 12-13; Pl. SMJ Opp. 15.

The parties spend a significant amount of time discussing the characteristics of Hungarian kfts.; however, neither party spends sufficient time on the necessary antecedent question: In

---

[8] This problem is compounded by the general slipperiness between different forms of domestic business organizations, as different states impose different requirements on particular forms and many default or traditional rules are subject to customization by particular enterprises.

American law, what characteristics differentiate a corporation from a limited liability company? Although the exact characteristics of corporations and limited liability companies vary from state to state, Virginia law provides a helpful starting point. In Virginia, limited liability companies, like stock corporations,[9] may exist indefinitely, have the ability to sue and be sued, and generally have all "the same powers as an individual to do all things necessary or convenient to carry out its business and affairs." Va. Code Ann. § 13.1-1009. In addition, like corporations, limited liability companies, as the name suggests, limit the personal liability of their members on behalf of the organization. Id. § 13.1-1019. Unlike corporations, limited liability companies are, by default, managed by the members[10] themselves rather than by an elected board of directors; however, limited liability companies may opt to be managed by an elected manager or group of managers and the shareholders of a corporation may opt to forgo a board of directors. Compare id. § 13.1-1022, with id. § 13.1-673. In addition, there are restrictions imposed on the alienability of membership interests in limited liability companies, as the only transferable interest is the member's share of the profits and losses and the right to receive distributions, and the default rule is that the assignment of a membership interest does not allow the assignee to participate in the management of the limited liability company or become a member. Id. §§ 13.1-1038 to -1039. By contrast, corporate shares are generally freely alienable (although the shareholders may impose restrictions on alienability), and the voting rights that come with being a shareholder follow the shares. Id. §§ 13.1-649, 13.1-662. In addition, unlike a corporation, a limited liability company is treated like a partnership for federal income tax purposes. See Estep v. Xanterra

---

[9] Because neither party appears to argue that kfts. are most similar to nonstock corporations, the Court finds it unnecessary to elaborate on the distinguishing features of the Virginia nonstock corporation.

[10] Each individual with an interest in a limited liability company is referred to as a "member" rather than, as in the corporate context, a "shareholder."

Kingsmill, LLC, No. 4:16-cv-89, 2017 WL 1103179, at *1 (E.D. Va. Mar. 20, 2017) (citing Jordan v. Commonwealth, 549 S.E.2d 621, 622-23 (Va. 2001)).[11] These distinguishing characteristics are reflected in the leading case law cited by the parties. See, e.g., Fellowes, 759 F.3d at 788 (discussing the defendant LLC's having "members" rather than "shareholders" and the inalienability of memberships); Lear Corp. v. Johnson Electric Holdings Ltd., 353 F.3d 580, 582-83 (discussing the defendant corporation's perpetual existence, governance by a Board of Directors, ability to issue tradeable shares, and treatment as independent of its investors).

As the expert reports submitted by both sides make clear, the Hungarian kft. falls closer to an American-style limited liability company than to an American corporation with respect to these distinguishing characteristics. First, equity owners of kfts., called "quotaholders" or "members," have a membership interest in the kft. similar to that of members in a limited liability company. See Resp. SMJ Mem. Ex. I. The membership interest, known as a business quota, is "not embodied by any security"—and therefore is not tradeable on an exchange or subject to Hungarian securities laws—but is instead a "notional category." Id. at 2. Although the quotas are, like members' interests in limited liability companies, alienable to a degree, there are a number of restrictions on alienation that kfts. may choose to adopt, including making transfers to nonmembers subject to the consent of the company or to a right of first refusal by other members. See id.; Pl. SMJ Opp. Ex. N. Moreover, the 1997 Company Act, which was in effect when the Complaint was filed in this civil action, appears to require that a kft. consent before any transfer of a membership interest to a nonmember party and that the kft. include conditions for granting or refusing consent in the articles of association. Pl. SMJ Opp. Ex. N, at 17.

---

[11] In 26 C.F.R. § 301.7701-2(b), the IRS defines the term "corporation" for federal tax purposes. It includes a list of foreign business designations that represent corporations per se, including the Hungarian "reszvenytarsasag," but does not include kfts. in that list.

12

Additionally, kfts. appear to be managed more like limited liability companies than corporations. A kft. is managed by one or more managing directors, who may be members of the kft., rather than by a separate Board of Directors. Resp. SMJ Mem. Ex. I. Although the managing directors may be nonmembers, unlike Boards of Directors each individual manager of a kft. may individually sign documents or act on behalf of the kft. or the managers may have joint authority, as provided for in the kft.'s organizing documents. Id. Given the use of intangible business quotas rather than shares, the inclination toward restrictions on alienations of members' interests, and the management by managing director(s) rather than by a Board of Directors, kfts. are substantially more like limited liability companies than like corporations.

This conclusion is further supported by plaintiffs' conduct and by Hungarian law. Before the Complaint was filed, various plaintiffs were associated with communications and documents indicating that the plaintiffs viewed the two defendant kfts.—Peterfia and MediaTechnik—as LLCs, not corporations. For example, in February 2003, Hawkins received an email discussing his ownership of "PETERFIA-Ingatlan LLC"; in March 2003, Hawkins received another email discussing "Peterfia-ingatlan LLC"; MediaTechnik's billing statements, licensing agreements, and marketing materials referred to it as an LLC; plaintiffs Panchley and Gabor both sent emails from MediaTechnik email accounts, including to plaintiff Zato, that included a signature block referring to "MediaTechnik LLC"; and most directly, plaintiffs Zato and Gabor received an email in December 2003 from another MediaTechnik employee, which asked Zato to send original signed invoices and expense reports to the sender and explicitly asked him to "use 'MediaTechnik LLC.' in the field 'Name' (instead of 'Mediatechnik, Inc.')" because "this is our correct firm name." Resp. SMJ Mem. Exs. B-H. Although these exhibits were all discussed and included in respondents' opening brief, plaintiffs' response brief did not even attempt to explain

13

or contextualize the parties' repeated use of "LLC" when referring to the kfts. Plaintiffs' silence is deafening.

Moreover, Hungarian law distinguishes between a kft. and a "reszvenytarsasag" ("rt."). Resp. SMJ Reply [Dkt. No. 337] Ex. C. Unlike a kft., an rt. issues digital or physical shares, which are generally freely alienable and may be publicly traded in a stock exchange. Id. at 5-6. In addition, unlike a kft., an rt. is generally required to have a board consisting of at least three board members. Id. at 6. Therefore, an rt. much more closely aligns with the American idea of a corporation and the distinctions between an rt. and a kft. favor finding that a kft. is more like a limited liability company and that an rt. is more like a corporation.

To support their contrary view, in addition to the arguments discussed above, plaintiffs provide a list of "attributes of corporate-ness" that Hungarian kfts. possess, Pl. SMJ Opp. 18-19, and argue that defendants previously admitted that the kfts. were corporations, id. at 9-14. Although plaintiffs provide a detailed list of "attributes of corporate-ness," they fail to include on this list the attributes that distinguish limited liability companies from corporations, which means that the list is of limited value in answering the question of whether kfts. are more like corporations or more like LLCs. In addition, defendants' previous motions and admissions are not binding on the Court. As discussed above, the Court has an obligation to assess its own subject matter jurisdiction. Because parties may not stipulate to jurisdiction, the Court has an obligation independently to determine whether kfts. are LLCs or corporations, a determination critical to resolving whether the Court has jurisdiction under § 1332(c).

Based on this record, the Court concludes that kfts. are not corporations for purposes of § 1332(c) but instead should be treated like limited liability companies, which take the citizenship of each member. There appears to be no disagreement that plaintiff Hawkins was a member of

defendant Peterfia kft.[12] when the Complaint was filed. See Resp. SMJ Mem. Exs. A-B. As such, there was not complete diversity between the parties and the Court did not have subject matter jurisdiction over this litigation when the Complaint was filed.

Plaintiffs argue that such a conclusion should not end the Court's analysis, because Fed. R. Civ. P. 21 allows a court to drop a dispensable party even after judgment has been entered. Pl. Opp. 25-28. The decision whether to dismiss the nondiverse party is within the sound discretion of the district court and will not be reversed on appeal unless it is based upon "misconceptions of law" or is a "clear abuse" of discretion. Martinez v. Duke Energy Corp., 130 F. App'x 629, 636 (4th Cir. 2005).[13] In this case, although the Court recognizes the general preference for preserving judgments once entered and jurisdiction once exercised, plaintiffs' conduct justifies refusing to apply Rule 21 to dismiss Peterfia. As discussed above, there is abundant evidence, which has gone undiscussed by plaintiffs, that plaintiffs were well aware that the kfts. were like limited liability companies, rather than like corporations, and it was settled law in the Fourth Circuit when the Complaint was filed that a limited liability company's citizenship is the same as that of its members. See Gen. Tech. Applications, Inc. v. Exro Ltda, 388 F.3d 114, 121 (4th Cir. 2004) ("A limited liability company . . . is an unincorporated association, akin to a partnership for diversity purposes, whose citizenship is that of its members."). At best, plaintiffs did not engage in the necessary due diligence before bringing this civil action to determine whether there was appropriate jurisdiction; at worst, they actively concealed two defendants' status as akin to limited liability companies to manufacture diversity jurisdiction. In addition, plaintiffs allowed

---

[12] There is some disagreement about whether any plaintiffs were also members of MediaTechnik kft. when the Complaint was filed. Because diversity jurisdiction requires complete diversity, just one plaintiff being non-diverse with one defendant is sufficient to destroy subject matter jurisdiction. Therefore, the Court need not resolve this disagreement.

[13] Respondents argue that Peterfia is an indispensable party, but the Court need not resolve that argument because the Court will not exercise its discretion to dismiss Peterfia.

this jurisdictional defect to go uncorrected for more than a decade and only now, years after judgment, seek to drop one of the original defendants to maintain jurisdiction. Courts have found that a plaintiff's "fail[ure] in its duty to investigate and establish . . . jurisdiction" weighs against exercising discretion under Rule 21 to dismiss a nondiverse party. PayoutOne, LLC v. Coral Mortg. Bankers, No. 08-cv-1617, 2009 WL 3526578, at *7 (D. Colo. Oct. 22, 2009); see also In re iBasis, Inc. Derivative Litig., 551 F. Supp. 2d 122, 126-27 (D. Mass. 2008); Estate of Davidson v. Columbia Hospital for Women Med. Ctr., Inc., Civ. No. 90-580, 1991 WL 277434, at *2 (D.D.C. Dec. 11, 1991). Given these considerations, as well as the possibility of plaintiffs pursuing their underlying claims in Hungary, where the original defendants and the new respondents may all be found and the claims heard on the merits in a single consolidated action, the Court declines to exercise its discretion to dismiss defendant Peterfia kft. from this civil action and instead will dismiss the Complaint for lack of subject matter jurisdiction.[14]

### III. CONCLUSION

For the reasons stated above, respondents' Joint Motion to Vacate for Lack of Subject Matter Jurisdiction [Dkt. No. 323] will be granted by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 8th day of February, 2018.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge

---

[14] Accordingly, the Court need not address the other arguments made by respondents about the validity of the injunction and default judgment.