IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| WILLIAM HAWKINS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:05-cv-1256 (LMB/JFA) |
| | ) | |
| LASZLO BORSY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

Before the Court is defendant i-TV's Motion to Dismiss Plaintiffs' Contempt Claim

("Motion"), which plaintiffs oppose. For the reasons that follow, i-TV's Motion will be granted,

plaintiffs' contempt claim against i-TV will be dismissed, and plaintiffs' Motion to Enforce

Judgment will be denied.

I.

This civil action has a "long and tortured procedural history," [Dkt. No. 94] at 14, of

which only the most relevant aspects will be recounted here. "In the early 2000s, [defendant

Laszlo Borsy ("Borsy")] controlled three Hungarian business entities: MediaTechnik kft. (a

software company), i-TV[1] (the operator of a cable television network in Debrecen, Hungary),

and Peterfia kft. (a real estate company that owned the buildings used by MediaTechnik and i-

TV)." Hawkins v. i-TV Digitalis Tavkozlesi zrt., 935 F.3d 211, 216 (4th Cir. 2019). "In 2002 and

2003, Borsy sold roughly one-third of MediaTechnik and Peterfia to an American, Plaintiff

William Hawkins, in exchange for an investment of $330,000." Id. at 217. Shortly thereafter,

---

[1] This business entity has changed its name over the course of these proceedings. For the sake of
simplicity, its current name, i-TV, will be used.

Borsy proposed a "roll-up" transaction, which would bring MediaTechnik, i-TV, and Peterfia under the control of a single parent company, Mediaware Corporation. Id. To facilitate this transaction, Borsy solicited an additional $1 million investment from Hawkins and invited the four other plaintiffs, each an executive or engineer in the computer-software industry, to participate in the roll-up, promising that plaintiffs would be provided ownership stakes and salaries in exchange for their capital contributions or professional services. Id. "Plaintiffs claim that they lived up to their end of the bargain but Borsy did not live up to his. Instead, they claim, he absconded with their money and the fruits of their labor." Id.

Plaintiffs filed suit in October 2005 against Borsy, Mediaware, MediaTechnik, Peterfia, and i-TV, requesting, among other relief, an order that Borsy and the various companies provide plaintiffs the shares they were promised. Because defendants failed to answer the complaint within the required timeframe, default was entered against them. In April 2006, defendants appeared through counsel and moved to set aside the default, which motion was granted. The case proceeded to discovery; however, in May 2006, defendants' counsel withdrew, and plaintiffs moved for a second entry of default due to defendants' failure to participate in discovery. Again, default was entered against them. Plaintiffs next moved for a default judgment, and the assigned magistrate judge issued a Report and Recommendation ("the Report") recommending that the Court enter a default judgment in plaintiffs' favor, including over $1.5 million in compensatory relief and an injunction requiring defendants to deliver the promised ownership interests.

Approximately two weeks later, Borsy reappeared and requested a 30-day extension of time to file objections to the report, which was granted. The next day, plaintiffs filed an emergency motion requesting prompt entry of their requested judgment and arguing that Borsy

was engaging in "ongoing efforts to dissipate assets rightfully belonging to Plaintiffs and to render any judgment in favor of Plaintiffs meaningless." [Dkt. No. 84]. On October 2, 2006, the Court granted this request in part, ordering that "the defendant Borsy and the defendant companies are enjoined from disposing or dissipating any assets, by sale, merger, or otherwise, or from undertaking any transactions out of the ordinary course of business, without the consent of the shareholders holding a majority of the stock in such companies." [Dkt. No. 86].[2]

Four days later, Borsy issued i-TV shares to a company called DIGI Távközlési és Szolgáltató kft ("DIGI kft."), which thereby became the majority owner of i-TV. On January 16, 2007, plaintiffs filed an Emergency Supplemental Memorandum in Support of Motion for Entry of Judgment, arguing that Borsy's actions violated the October 2, 2006 injunction and asking the Court to hold Borsy and i-TV in contempt. On February 8, 2007, the Court adopted the magistrate judge's Report and entered a default judgment in favor of plaintiffs, without explicitly addressing plaintiffs' contempt claim. As part of the judgment, the Court ordered that defendants pay damages, declared that plaintiffs owned a collective 56.14 percent of the original defendant companies, and ordered that "defendants are prohibited from disposing of or dissipating any assets of the defendant entities and the defendant entities may not engage in any transactions without the consent of plaintiffs Thomas Hawkins, Eric Keller, Kristof Gabor, Justin Panchley, and Thomas Zato." [Dkt. No. 95]. Despite this judgment, in October 2008, DIGI Kft. acquired Borsy's remaining shares of i-TV.

---

[2] Although this was the only relief explicitly ordered in the October 2, 2006 Order, the first section of that Order provided a more detailed explanation of the relief being granted: "[T]he injunctive relief recommended by the magistrate judge in his Report and Recommendation will be immediately imposed to prevent the defendants from disposing or dissipating assets subject to this litigation or undertaking transactions affecting the property at issue without consent of the plaintiffs." Id.

Although they initially pursued their claim by making some contact with DIGI Kft., plaintiffs "never initiated enforcement proceedings in Hungary." Hawkins, 935 F.3d at 218. Plaintiffs explain that they "considered filing a lawsuit in Hungary against DIGI Kft. and contacted the American Embassy in Hungary for assistance," but opted not to do so after the Embassy "warned Plaintiffs that a lawsuit would likely be futile, citing that '[the Embassy's] experience with the judicial system [in Hungary] has not been great.'" [Dkt. No. 109] at 9.

"The judgment lay mostly dormant until 2017," when the plaintiffs learned that one of i-TV's indirect parent companies was preparing for an initial public offering on the Bucharest Stock Exchange, and moved to enforce the judgment against Borsy and i-TV (the original defendants), as well as against DIGI kft., which had bought i-TV from Borsy, and DIGI kft.'s European up-stream corporate parents.[3] Hawkins, 935 F.3d at 216. In their motion, plaintiffs sought monetary damages, injunctive relief, compensatory damages as a sanction for contempt, attorney's fees, and disgorgement of respondents' revenue "derived from [p]laintiffs' ownership interest in i-TV." [Dkt. No. 109] at 24-28. In response, i-TV and the newly-added respondents moved to vacate the default judgment for lack of subject matter jurisdiction. That motion was granted. In August 2019, the Fourth Circuit reversed, holding that the Court erred in finding the default judgment void because there was an "arguable basis" for subject matter jurisdiction; however, the Fourth Circuit also held that the Court lacked personal jurisdiction over the newly-added respondents against whom plaintiffs were attempting to enforce the default judgment. Hawkins, 935 F. 3d at 221, 226-232.

---

[3] The Fourth Circuit refers to DIGI kft. and its corporate parents as "Respondents" rather than defendants, because they "were added only in the 2017 attempt to enforce the 2007 judgment," Hawkins, 935 F.3d at 216 n.2; accordingly, they are referred to as "respondents" in this opinion.

The Fourth Circuit's ruling left i-TV as the only remaining defendant against whom the Court could properly enforce the default judgment.[4] The Fourth Circuit observed that to continue pursuit of the remaining claims may be no "more than a fool's errand: i-TV appears to have no U.S. presence. And there are other issues, like laches, that potentially stand in the way of the Plaintiffs' attempt to enforce the 2007 injunction against i-TV." Hawkins, 935 F. 3d at 232.

Upon issuance of the mandate, the Court dismissed the respondents and ordered plaintiffs and i-TV to provide a status report. Because plaintiffs represented that they intended to petition the United States Supreme Court for a writ of certiorari regarding the Fourth Circuit's August 2019 opinion, the Court stayed the proceedings on October 15, 2019. On February 24, 2020, the Court ordered the parties to provide a status report, given that plaintiffs' deadline for filing a petition for a writ of certiorari had expired weeks before and no petition had been filed. Plaintiffs did not provide an explanation for their failure to keep the Court apprised of their decision not to seek certiorari, but stated that they intended to pursue judgment against i-TV for contempt of the October 2006 injunction. i-TV responded that "[i]t seems entirely fitting that, in a case where Plaintiffs delayed a full decade to enforce their judgment, they obtained months more delay by indicating intent to petition the Supreme Court and failing to do so, without explanation." [Dkt. No. 377]. i-TV also proposed that the parties brief potentially dispositive legal defenses, such as laches, before proceeding to discovery on the contempt issue. The Court found good cause to grant i-TV's request.

---

[4] Although Borsy is also named in plaintiffs' Motion to Enforce Judgment, he "appears to be in the wind" and "never appeared in the proceedings" before the Fourth Circuit. Hawkins, 935 F.3d at 219 n.3.

In its motion to dismiss plaintiffs' contempt claim,[5] i-TV makes three arguments: (1) plaintiffs' attempt to hold i-TV in contempt is barred by the law-of-the-case doctrine; (2) i-TV never violated the October 2006 injunction; and (3) plaintiffs' contempt claim is barred by laches. Plaintiffs have opposed the motion, which is fully briefed and ripe for review.

II.

Determining if a plaintiff states "a plausible claim for relief" is a "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Affirmative defenses and procedural bars to relief can be considered to the extent that they are apparent on the face of plaintiffs' claim. Richmond, Fredericksburg, & Potomac R. Co. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993).

i-TV's first two arguments—that it did not violate the injunction and that plaintiffs' relief is barred by the law of the case doctrine—reveal the parties' disagreements about the issues. i-TV submits that it did not violate the October 2, 2006 injunction because the Court enjoined defendant companies from "disposing or dissipating any assets, by sale, merger, or otherwise, or from undertaking any transactions out of the ordinary course of business, without the consent of the shareholders holding a majority of the stock in such companies," [Dkt. No. 86] at 1-2 (emphasis added); however, at the time of the transfer that motivated plaintiffs' original claim of contempt, Borsy still held the majority of i-TV's shares. [Dkt. No. 386] at 9. Plaintiffs counter that the purpose of the injunction, made clear in its explanatory text, was to prevent defendants from "undertaking transactions affecting the property at issue without consent of the plaintiffs."

---

[5] i-TV's motion to dismiss [Dkt. No. 385] cites to [Dkt. No. 377] as the source of plaintiffs' contempt claims. That docket entry is the status report in which plaintiffs confirmed their intent to pursue the claim for contempt that they originally raised in their Motion to Enforce Judgment [Dkt. No. 109].

Id. at 1 (emphasis added). In addition to the ambiguity in the 2006 injunction,[6] there is a more fundamental disagreement between the parties as to what conduct exactly is the basis for the contempt claim. Plaintiffs explain this disagreement in their opposition to dismissal: "i-TV claims it did not violate the Court's October 2006 Injunction, but that argument mischaracterizes that Injunction and ignores that Plaintiffs' contempt claim also is based on the Court's injunction in its February 2007 Judgment." [Dkt. No. 389] at 15.

The parties similarly dispute the applicability of the law of the case doctrine to plaintiffs' contempt claim. i-TV argues that by issuing its judgment without expressly granting plaintiffs' first request to hold i-TV in contempt, the Court "foreclose[d] relitigation" of the contempt issue. [Dkt. No. 386] at 7 (quoting United States v. Conyers, 284 F. App'x 19, 21 (4th Cir. 2008)). Plaintiffs maintain that because judgment was ultimately entered against defendants, it was therefore consistent with a finding of contempt and the issue was neither expressly nor impliedly decided. [Dkt. No. 389] at 14 (citing Norman v. Apache Corp., 19 F.3d 1017, 1021 (5th Cir. 1994)).

The Court need not resolve these conflicting positions, because even accepting plaintiffs' arguments that i-TV violated the 2006 order and the 2007 judgment, and that the law of the case doctrine does not apply, the doctrine of laches would still bar the relief plaintiffs seek.

III.

"The doctrine of laches is based on the maxim that equity aids the vigilant, not those who sleep on their rights." Lyons P'ship v. Morris Costumes, Inc., 243 F.3d 789, 797 (4th Cir. 2001). To sustain a defense of laches requires proof of "(1) lack of diligence by the party against

---

[6] It is noteworthy that plaintiffs made no effort to ask the Court to correct this obvious ambiguity in the injunction order.

whom the defense is asserted, and (2) prejudice to the party asserting the defense." Giddens v.
Isbrandtsen Co., 355 F.2d 125, 127 (4th Cir. 1966) (quoting Costello v. United States, 365 U.S.
265, 282 (1961)). As an affirmative defense, laches "can be raised by motion to dismiss" only if
"the claim asserted is patently stale upon its face." McMullen v. Lewis, 32 F.2d 481, 484 (4th
Cir. 1929). Plaintiffs argue that it is "inappropriate" to resolve laches on the face of the
complaint because it is usually a "fact-intensive analysis." [Dkt. No. 389] at 16 (quoting Acosta
v. Jardon & Howard Techs., Inc., No. 4:18-CV-16, 2018 WL 5779506, at *2 (E.D.N.C. Nov. 2,
2018)). This argument is unpersuasive in the present action, in which the factual record has been
developed and litigated for over a decade. The Court finds that this is one of those "rare" cases in
which laches can and should be decided on the face of plaintiffs' Motion to Enforce Judgment.
Acosta, 2018 WL 5779506, at *2; CSX Transp., Inc. v. Gilkison, 406 F. App'x 723, 729 (4th
Cir. 2010).

     1. Lack of Diligence

     A plaintiff shows lack of diligence for the purposes of laches if his or her delay is
unreasonable or inexcusable. Perry v. Judd, 471 F. App'x 219, 224 (4th Cir. 2012). "An
inexcusable or unreasonable delay may occur only after the plaintiff discovers or with reasonable
diligence could have discovered the facts giving rise to his cause of action." White v. Daniel, 909
F.2d 99, 102 (4th Cir. 1990). i-TV alleges the delay in this case amounted to more than ten years,
starting when plaintiffs filed their first contempt motion in October 2006. [Dkt. No. 386] at 11.
Plaintiffs instead measure the lapsed time from DIGI Kft.'s 2008 acquisition of i-TV, which they
assert violated the 2007 default judgment order. [Dkt. No. 389] at 10; [Dkt. No. 109] at 8. Even
on plaintiffs' more generous timeline, the result is a delay longer than eight years between when
they "discover[ed]...the facts giving rise to [their] cause of action" and when they brought that
cause of action before the Court in May of 2017. White, 909 F.2d at 102. Courts have found far

shorter delays to be unreasonable. See, e.g., I/P Engine, Inc. v. AOL Inc., 915 F. Supp. 2d 736, 746-47 (E.D. Va. 2012) (six years); Continental Cas. Co. v. Marine Hydraulics Int'l, Inc., No. 82-606-N, 1983 WL 188046, at *2 (E.D. Va. Jan. 18, 1983) (five years).

 Plaintiffs contend that the delay, even if unreasonable, should be excused by the obstacles they anticipated in enforcing their judgment against i-TV abroad. They cite that the American Embassy in Hungary warned them "that a lawsuit would likely be futile," [Dkt. No. 389] at 15, and that they faced a "lack of options and money after spending years litigating the first phase of this lawsuit." Id. at 15. Whether or not plaintiffs were in a better financial position to succeed in their action in 2017 than they were in 2008 is beside the point; that a delay potentially improved plaintiffs' chances of victory when they eventually brought an action does not excuse their delay in bringing it. See White, 909 F.2d at 103 (holding that plaintiffs' delay was not excused even though in the intervening years after their claim accrued, more evidence supporting their position was produced).

  2. Prejudice

 Whether a defendant suffered prejudice as a result of a plaintiff's delay is a question that "contemplates the dispersal and inaccessibility of witnesses, the dimming of recollections and other disadvantages incident to the lapse of time." Giddens, 355 F.2d at 127. For instance, as i-TV correctly argues, Borsy—a key witness to i-TV's conduct in 2007 and 2008—was an active participant in the litigation when plaintiffs' cause of action first accrued, but his unknown whereabouts render him inaccessible now. [Dkt. No. 386] at 12. On top of prejudicing i-TV's ability to litigate effectively, plaintiffs' long delay in enforcing their judgment has also given rise to economic prejudice against i-TV and the dismissed respondents. "Economic prejudice arises 'where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit.'" I/P Engine, 915 F. Supp. 2d

at 743 (quoting A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1033 (Fed. Cir. 1992)). Permitting plaintiffs to enforce their judgment against i-TV after they sat on their rights for eight years would clearly have a negative impact on the investments made by the respondents who were dismissed from this litigation by the Fourth Circuit. See Hawkins, 935 F.3d at 232.

Plaintiffs respond that any economic prejudice that i-TV's parent companies may suffer is the result of their failure to comply with the Court's default judgment order, rather than plaintiffs' unreasonable delay: "[T]he money owed to [plaintiffs] by [defendant] is precisely the money that has enabled [defendant's] success." [Dkt. No. 389] at 19 (quoting Flame S.A. v. Indus. Carriers, Inc., 24 F. Supp. 3d 493, 504 (E.D. Va. 2014)). That argument runs counter to the purpose of the doctrine of laches, which is designed to limit the recovery of those who have slept on their rights even when their claim may otherwise have been well-founded. Laches does not permit a plaintiff to wait while a defendant "develop[s] its products ... and expand[s] its business, only then to lower the litigation boom" when it has become lucrative to pick the litigation back up where plaintiff left off. What-A-Burger of Va., Inc. v. Whataburger, Inc., 357 F.3d 441, 449 (4th Cir. 2004).[7] Moreover, even if plaintiffs' original investments are responsible for some portion of the growth that i-TV has experienced in the intervening years, plaintiffs' extended delay has made it difficult, if not impossible, to tease out how much of i-TV's successes trace back to plaintiffs' contribution. See White, 909 F.2d at 102 (finding that "the

---

[7] Plaintiffs urge that What-A-Burger actually supports their position, because the court rejected a laches defense after a 32-year delay. Although literally true, this argument misses the point: the Fourth Circuit only rejected laches because it found that the plaintiff had not had a claim that it could have brought during the alleged delay. Here, no party disputes that there have not been any impediments, other than plaintiffs' concerns about cost and futility, which prevented them from timely pursuing enforcement of their judgment.

greater the delay, the less the prejudice required to show laches" because prejudice can be inferred from the length of the delay).

IV.

For the reasons stated above, the defendant i-TV's Motion to Dismiss Plaintiffs' Contempt Claim [Dkt. No. 385] will be granted. Because the defense of laches applies equally to plaintiffs' discovery request and claim for fees, sanctions, and damages, the plaintiffs' Motion to Enforce Judgment [Dkt. No. 109] will be denied and judgment under Fed. R. Civ. P. 58 will be entered in favor of defendant i-TV through an Order that will issue with this Memorandum Opinion.

Entered this 27 day of August, 2020.

Alexandria, Virginia

_____ /s/

Leonie M. Brinkema
United States District Judge